THE CITY OF QUINCY, Plaintiff-Appellee, v. LINDA DANIELS, Defendant-Appellant.

Fourth District   No. 4—92—0980

Argued May 11, 1993.—Opinion filed June 17, 1993.

John J. Ammann (argued), of Land of Lincoln Legal Assistance Foundation, Inc., of Alton, for appellant.

Anthony B. Cameron, of Quincy, for appellee.

JUSTICE LUND delivered the opinion of the court:

Following a bench trial in the circuit court of Adams County, defendant was found guilty of trespass under section 31.138 of the Municipal Code of the City of Quincy (Municipal Code) (Quincy, Ill., Municipal Code §31.138 (1980)) and fined $55 plus costs of $45. Defendant appeals claiming, among other things, that the trespass ordinance is inapplicable to a person whose presence on the property is at the express invitation of the tenant in possession. Furthermore, defendant contends that the Forcible Entry and Detainer Act (Forcible Entry Act) (Ill. Rev. Stat. 1991, ch. 110, par. 9—101 et seq.) is the exclusive remedy for settling disputes of this nature. The City of Quincy (City) states the Forcible Entry Act may be the exclusive remedy for landlords, but contends it does not preempt the City under its home-rule power to prosecute and civilly punish nontenant trespassers who have been properly warned. Based upon the facts in the present case, we reverse.

In December 1991, Terry Jones rented an apartment from George and Pat Davis. He signed a written rental agreement which appears, based upon court testimony, to have created a month-to-month tenancy. The rental agreement included a provision stating that the tenant shall not house permanent guests on the premises or assign or sublet the premises without the landlord's permission.

In early March 1992, the Davises became aware that Jones' mother, defendant Linda Daniels, was staying in the apartment. Her son had initially rented the apartment because of marital problems. By early March, he and his wife had begun to work out their problems and he was only staying in the apartment off and on. He gave permission to his mother to stay in the apartment.

Defendant was unemployed and, when she learned that her son was moving out, she contacted the Two Rivers Regional Council (Two Rivers) to determine whether it would pay her rent. The Davises testified that they first learned of defendant's presence when they received a call from Two Rivers offering to pay rent. They refused the offer and immediately went to the apartment and notified defendant that she was trespassing and had 48 hours to move out. No attempt was made to collect rent or create a tenancy with defendant. At the

same time, they contacted Jones and told him to get his mother out of the apartment. Jones advised the Davises he was planning to move out of the apartment and suggested that his mother be allowed to assume the tenancy. The Davises refused.

The trial record presents conflicting evidence regarding the status of Jones' tenancy at the time the Davises learned of the presence of his mother. At one point, Pat Davis stated that Jones told her he had already moved out of the apartment. She believed the information received from Two Rivers verified this fact. This testimony should be compared with the somewhat contradictory exchange quoted below:

"Q. [Defense attorney in cross-examination:] At no time did you give Mr.—Mr. Jones a five[-]day notice to terminate his tenancy, or 10 day or 30 day.

A. [Pat Davis:] No.

[Defense attorney]: Thank you. I have nothing further.

REDIRECT EXAMINATION BY [Prosecutor]:

Q. Why not?

A. Oh, why didn't I?

Q. Sure.

A. Because we (Inaudible)—oh, why didn't we terminate his lease?

Q. Correct.

A. Okay. Because we didn't know if he had moved. He was renting from us, which was fine, and then we found out that he had moved. He had terminated the lease.

Q. So he—

[Defense attorney]: I'm going to object to the foundation how she found out he had moved.

[Pat Davis]: He told us that he—

THE COURT: Sustained."

She testified that when she inspected the apartment, it was clear to her that he no longer lived there. This conclusion was based upon the fact that she saw a lot of defendant's things in the apartment and Jones was not present.

Jones testified that he resided at the apartment up until a week before the Davises changed the locks. He had given his mother permission to live there and never withdrew his permission. Although he was in the process of moving out, he still kept personal possessions such as clothes and furniture in the apartment. Contrary to Pat Davis' statement, Jones testified, "I told her that I would move—I was moving out."

After the 48 hours had elapsed, George Davis called the Quincy police department. Officer Window went to the apartment and told defendant he was there at the direction of Deputy Chief LaTour to inform her that anyone residing in the apartment other than the person who had signed the lease was trespassing and they were to vacate the property by the same time the following day. If she did not vacate the apartment, she would be arrested for trespassing. Defendant responded that it was her son's apartment and that they would be talking to their attorney.

The following day, Officer Martin came to the residence and, after confirming that defendant had spoken with Officer Window on the day before, advised defendant she was trespassing and that she was to leave the premises. Defendant advised Martin that Jones was her son and that he lived there off and on. At this time, Martin formally charged defendant with trespassing and issued a citation. Sometime later, defendant left the apartment and the Davises had the locks changed.

There is no question that Jones created a valid tenancy in this apartment when he signed the rental agreement. Although staying in the apartment on an irregular basis at the time the citation was issued, Jones still kept personal possessions, including clothing and furniture, in the apartment. No notice was given that his lease had been terminated. Pat Davis testified that Jones had terminated the lease, but we find no evidence that he had willfully and completely abandoned the apartment. At best, Jones expressed an intention to terminate his tenancy at some future date.

■ Our court has held that a person on leased premises at the express invitation of the tenant is not a trespasser as a matter of law. (*Karow v. Student Inns, Inc.* (1976), 43 Ill. App. 3d 878, 883, 357 N.E.2d 682, 687; see also *People v. Rynberk* (1980), 92 Ill. App. 3d 112, 415 N.E.2d 1087.) This principle is reflected in section 21—3(c) of the Criminal Code of 1961 (Code), which states that a charge of criminal trespass to real property does not apply to anyone living on land by occupancy, leasing, or other agreement with the owner, nor to anyone invited by such a person to visit him at the place he is leasing. (Ill. Rev. Stat. 1991, ch. 38, par. 21—3(c).) This principle is absent from the Municipal Code under which defendant was charged and convicted. Section 31—138 of the Municipal Code provides in pertinent part that unlawful trespass can be defined, *inter alia*, as a failure or refusal to depart from the premises of another in case of being requested, either orally or in writing, to leave by any owner or occupant thereof. Quincy, Ill., Municipal Code §31.138(c) (1980).

■■ The City agrees that a landlord's exclusive remedy for evicting a person occupying property without right is the Forcible Entry Act. However, because the City has no property interest in this apartment building, it contends that it should not be preempted from asserting its home-rule power to prosecute trespassers under the municipal ordinance. We agree that the Forcible Entry Act does not preempt the City's home-rule powers in this case. However, the trespass ordinance itself, to the extent that it creates a criminal offense for conduct which the legislature has deemed to be noncriminal, is void.

The Illinois Constitution of 1970 authorizes a home-rule unit to "exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare." (Ill. Const. 1970, art. VII, §6(a).) The municipality may exercise and perform concurrently with the State any power or function of a home-rule unit to the extent that the General Assembly does not specifically limit the concurrent exercise or specifically declare the State's exercise to be exclusive. (Ill. Const. 1970, art. VII, §6(i).) However, the committee on local government of the constitutional convention stated:

"[I]f the state legislates but does not express exclusivity, home-rule units retain the power to act concurrently, *subject to limitations provided by law*. (This last phrase referring to statutory limitations is intended to cover the case where the legislature intends to permit concurrent local legislation, but only within limits that are consistent with the state statutory scheme. Surely if the state is permitted to exclude local governments from areas where the state has acted, it also should be able to restrict the nature and extent of concurrent local activity.)" (Emphasis added.) 7 Record of Proceedings, Sixth Illinois Constitutional Convention 1643-44.

The committee notes clearly envision a home-rule unit's concurrent exercise of power with the State as being subject to limitations provided by State law. This limitation is found in section 1–2(b) of the Code, which establishes that a primary purpose of the Code is to "limit the condemnation of conduct as criminal when it is without fault." (Ill. Rev. Stat. 1991, ch. 38, par. 1–2(b).) Proof that the committee on local government anticipated this restriction is shown in its statement that "confusion could result if the state were powerless to impose one criminal code upon the entire state and forbid municipalities from defining crimes in differing ways." (7 Record of Proceed-

ings, Sixth Illinois Constitutional Convention 1642.) The legislature's adoption of section 21—3(c) of the Code to our State law of trespass reflects a distinct statewide policy, underscored by court decisions, that criminal trespass may not be charged against invited guests on leased property. To the extent that it conflicts with this policy, the trespass statute of the City is invalid.

■ It is well settled that a landlord cannot use a criminal trespass statute to settle a dispute over the right of possession of land. (*People v. Evans* (1987), 163 Ill. App. 3d 561, 564, 516 N.E.2d 817, 819.) The City argues the ruling in *Evans* is limited to relationships between landlords and tenants. Because defendant has no transactional privity with the landlord, the City argues, the prohibition against prosecution disappears. Citing *Curtis v. Hollenbeck* (1900), 92 Ill. App. 34, the City contends that a person with no transactional privity does not enjoy the presumption of tenancy.

Leaving aside this strained interpretation of the *Curtis* decision, we find the issue of defendant's tenancy irrelevant to the case at hand. As defendant was occupying the apartment at the express invitation of the leaseholder, the only question of any relevance is whether this lease was still valid. The determination of the validity of a lease or whether the terms of a lease have been violated requires the application of landlord-tenant law, an analysis particularly unsuited to the criminal courts. The Forcible Entry Act provides the complete remedy at law for settling such disputes. *Evans*, 163 Ill. App. 3d at 564, 516 N.E.2d at 819.

Reversed.

KNECHT and COOK, JJ., concur.